**WARREN TELEPHONE COMPANY, In re.**

Public Utilities Commission.

No. 27147.   Decided December 19, 1958.

Power, Griffith & Jones, By John Robert Jones, for Applicant, The Warren Telephone Company.

Bruce Birrell, City Solicitor, for the City of Warren, Protestant.

Murray F. Hallett, Solicitor, for the City of Newton Falls, Protestant.

William B. Saxbe, Atty. Genl., By James F. DeLeone, Asst. Atty Genl., and Counsel for the Public Utilities Commission, for The Public Utilities Commission of Ohio.

## FINDINGS AND ORDER

The Commission coming now to consider the above-entitled Application and the exhibits attached thereto, the matters contained in the Report of the Secretary, issued pursuant to the provisions of §4909.18 R. C., the testimony and exhibits adduced at public hearings held in this proceeding, and, being otherwise fully advised in the premises and in compliance with §4903.09 R. C., hereby renders its Findings and Order.

**NATURE OF PROCEEDING:**

The Applicant, The Warren Telephone Company, seeks to increase its rates and charges for telephone service furnished to its subscribers through its Warren, Lordstown and Newton Falls exchanges.

**HISTORY OF PROCEEDING:**

On August 6, 1957, The Warren Telephone Company, Applicant

herein, filed with this Commission its Application seeking authorization of the Commission to increase its rates and charges for telephone service rendered by it within its operating area, and in accordance with alphabetically enumerated **paragraphs A, B,** and **C** of §4909.18 **R. C.**, filed with and attached to its Application certain exhibits purporting to represent:

(1) Exhibit A, a detailed inventory and appraisal as of December 31, 1956, of its property used and useful in the rendition of telephone service;

(2) Exhibit B, being a complete operating statement for the twelve-month period ending December 31, 1956;

(3) Exhibit B-1, a detailed Income Statement for the year 1956 as per books, and Income Statement adjusted for increased payroll and depreciation charges and toll settlement, Income Statement annualized as of December 31, 1956, and a Pro Forma Income Statement;

(4) Exhibit C, being a comparative statement of the revenue under the existing rates and the anticipated revenue under the proposed rates by exchanges and classes of service;

(5) Exhibit C-1, being P. U. C. O. No. 6, the present tariff now on file with this Commission;

(6) The proposed tariffs to be filed with this Commission for the purpose of establishing new rates to be charged to Applicant's subscribers, being P. U. C. O. No. 7, superseding P. U. C. O. No. 6; and,

(7) Exhibit D, being a study of the depreciation requirement of all the depreciable property of the Applicant used and useful in the rendition of telephone service as of December 31, 1956.

On August 7, 1957, this Commission issued its Entry approving the form of legal notice submitted with the Company's Application.

In accordance with §4909.19 **R. C.**, this Commission caused its Secretary to make an investigation of the matter set forth in said application. The Report of the Commission's Secretary was filed with the Commission on June 18, 1958, copies thereof being served on all interested parties as required by law.

Applicant filed its objections to the Secretary's Report on July 10, 1958. This was followed by the objections of the Village of Newton Falls, Ohio, filed July 17, 1958, and by the objections of the City of Warren, Ohio, filed July 21, 1958.

The Applicant's objections to the Report of the Secretary of the Commission may be summarized as follows:

(1) The offsetting of Federal Income and other tax accruals from the computation of working capital and maintenance material and supplies as includable in the recommended statutory rate base valuation;

(2) Inventory corrections, unit cost corrections, and corrections of general overhead allowances and other direct and indirect loading charges as made by the Engineering Staff in their valuation investigation;

(3) The amount of statutory depreciation determined by the Engineering Staff for deduction from the reproduction cost new of Applicant's plant and property;

(4) The recommended annual allowance for depreciation accruals as determined by the Engineering Staff; and,

(5) The adjustments to Applicant's revenue and expenses for the test year made by the Accounting Staff.

The objections of the City of Newton Falls, Ohio, and of the City of Warren, Ohio, Protestants herein, may be treated collectively. The objections of the Protestant cities primarily allege that operating revenues as disclosed by the Report of the Secretary and the exhibits of the Applicant are understated, and that, correspondingly, operating expenses as disclosed by the Report of the Secretary and exhibits of the Applicant are overstated, that the rates submitted are excessive and unreasonable, that the income available for fixed charges as reflected in said Report and exhibits is understated, and that the computed rate of return as reflected in the Secretary's Report is excessive.

Within the statutory period as prescribed by aforecited §4909.19 R. C., the Commission caused this proceeding to be set for public hearings, and hearings were had from time to time thereon.

**DISCUSSION:**

### RATE BASE

Applicant, The Warren Telephone Company, submitted with its Application a detailed inventory and appraisal of its plant and property used and useful in the rendition of telephone service as of December 31, 1956. The detailed reproduction cost new valuation less statutory depreciation thereof estimated by the Application and as ascertained by the Company's Consulting Engineers may be summarized as follows:

| | |
|---|---:|
| Reproduction Cost New at December 31, 1956 | $17,704,449.00 |
| **Less** Depreciation (5.74%) | 1,015,576.00 |
| | |
| Reproduction Cost New Less Depreciation | $16,688,873.00 |
| **Plus** Working Capital | 88,185.00 |
| **Plus** Material and Supplies | 584,279.00 |
| | |
| Total Proposed Statutory Rate Base | $17,361,337.00 |

As a result of its investigation the Commission's Engineering Staff recommended that the Applicant's Reproduction Cost New Valuation as submitted should be adjusted in the following respects:

(1) Inventory Corrections $439,441.00; (2) Unit Cost Corrections $871,411.00; and, (3) General Overhead Allowance Corrections $1,167,007.00, aggregating reductions in the appraisal valuation of $2,477,859.00. These adjustments resulted in a recommended Reproduction Cost New of Applicant's property at the date certain in the sum of $15,226,590.00, being a 14% reduction from the corresponding RCN submitted by the Applicant. A detailed analysis of these adjustments may be found in exhibits attached to the engineering section of the Report of the Secretary and for purposes of discussion they are set forth below:

**A. Inventory Corrections:**

| Acct. No. | Description | Amount |
|---|---|---:|
| 234 | Add for Highway Patrol PABX | $ 2,151.19 |
| 235 | Deduct for booth not found at H. H. Andrews | 354.69* |

| 243 | Add account finding No. 10 copper not No. 12 | 23,729.14 |
| | Deduct account finding shorter average span lengths | 76,817.72* |
| 244 | Deduct Construction Work in Progress | 77,282.35* |
| | Deduct account finding lesser amount of paving cut and restored in construction | 310,866.66* |

Sub-Total Account Inventory Corrections    $439,441.09*

*Denotes Red Figure

Applicant, while filing general objections to all items listed in the tabulation of Inventory Corrections, has challenged only those deductions from Accounts 243 and 244 that are listed above. In its Brief, Applicant complains that the Commission's Engineers, in investigating the property included under Account 243 in the Appraisal submitted by Applicant, and in making such deduction as listed above, failed to consider and allow for tie-wires and sag; and, further, that the methods used by Commission Engineers in measuring aerial wire actually in place would produce faulty or inaccurate results.

It is to be noted that in a proceeding of this nature, the burden of proof as to all matters, including the valuation of its property, is that of the Applicant. On the other hand, there is no affirmative duty upon the Commission or its Staff to go forward with any evidentiary phase of the proceeding. It is the sole duty of the Staff to investigate an Application for increased utility rates and make recommendations to this Commission on the matters in the proceeding that are encompassed within their respective technical jurisdictions. The formal report, known as the "Secretary's Report," submitted to and filed with the Commission is like any other evidence and subject to appropriate tests of cross-examination.

Examination of the testimony of Applicant's valuation witness, Mr. Jere S. Cave, with respect to the manner followed in the development of Account No. 243 discloses that aerial wire was measured by the foot from tracings made from maps of the City of Warren showing the location of the property (R. 248, 249), while Applicant's Counsel asserts in brief that the Applicant's determination was based on average span lengths ordinarily found in the type of construction which exists in The Warren Telephone Company properties. As to allowances for tie-wires and sag, not only did Applicant's valuation witness fail to testify on these subjects, but the Commission notes that the common practice is to use pre-formed tie-wires averaging approximately six inches in length, while any acount of sag that might increase the footage of wire actually in place in a telephone plant of this size would be insignificant.

In the cross-examination of Paul E. Hampton, the Commission's Chief Engineer, Applicant's Counsel sought to elicit the methods the Engineering Staff used in determining average span lengths of wire, and total amounts of existing aerial wire in Applicant's property, utilizing such average span lengths as a basis. This Staff witness testified that in making such determination, speedometers were used in rural areas, while tape lines and measuring wheel devices were used in congested urban

areas to measure actual span lengths at various locations sufficient in number to reflect average conditions in the properties. Thus, unlike Applicant's assumed lengths, the Commission's engineers made observed tests and samplings as to the span lengths in issue.

Applicant contends that the Engineering Staff's recommended deductions for construction work in progress from Account 244, "Underground Conduit," is arbitrary and should not be adopted. This Commission's rate-making power is fixed by statute and is limited to the consideration of "the value of all property of the public utility actually used and useful." Secs. 4909.04, 4909.05, and 4909.15 R. C. See also **City of Cleveland v. Public Utilities Commission of Ohio, 164 Oh St 442,** at 443. It is the opinion of the Commission, from the record herein, that the amount in question represents the value of certain property of the Applicant not actually used and useful in the rendition of its public utility telephone service as of the date certain of this proceeding, and, therefore, is not includable in its rate base valuation in the absence of proof to the contrary. **Mt. Vernon Telephone Corp. v. Public Utilities Commission of Ohio, 163 Oh St 381.**

In its determination of the value to be placed on the inventory in Account 244, the Applicant's consulting engineer included in the account balance the cost of cutting and restoring pavements over all underground conduit presently existing and in place which is now covered by pavement. (R. 263, 266.) In the investigation of this Account, the Engineering Staff requested data from Applicant showing what pavement, if any, which had been actually cut and restored in the process of constructing underground conduit. After a check of maps from the office of the Engineer of the City of Warren, deductions were made from the account balance where conduit had been constructed prior to pavement being laid by the municipal authority in question. (R. 665, 666, 667.) The cross-examination of the Commission's Chief Engineer, Paul E. Hampton, by Applicant's Counsel best illustrates the Staff's action, where, beginning at page 665 of the Record, he is questioned, in part, as follows:

"Q. Now, in that same table, I want to refer you to the same Account to a deduction of $310,866.66, and ask you if you will explain that deduction?

"A. Well, that is a net deduction of the cost of cutting and restoring paving over underground construction, such as conduits and manholes. The deduction is made on the basis that before the allowance can be included in this valuation, it must be substantiated that the Company absolutely did cut and replace the paving over the ducts, whereas in Exhibit A, that simply assumed that the paving had been cut and replaced over all ducts. After requesting substantiation on it from the Company, it was received in the form of certain data offered together by the Company and, I believe, the City Engineer of Warren, as to the date on which the underground installation was made and the date on which the streets were paved. We find from that data that the street was paved before the conduit was laid, and to allow for the cutting into the pavement to the extent that we did not find it had been paved before the ducts were made, we eliminated the cost of paving. * * *

"Q. What you did was to determine or require evidence as to paving that had been cut at the time these particular ducts were put in, is that correct?

"A. That is correct

"Q. In other words, you have deducted all except where it was proven that the paving had been cut at the time the ducts were installed, is that right?

"A. That is correct.

"Q. And for fairness and for the sake of the record, you do that on the authority of the Des Moines Gas Case? * * *

"A. I believe that is the case. It is an old case."

The case referred to by Applicant's Counsel is Des Moines Gas Company v. City of Des Moines, 238 U. S., 152, 59 L. Ed., 1244, the leading case in the United States on the question presented. This case has been approved and followed in Ohio and in the United States Supreme Court in **Newark Natural Gas & Fuel Co. v. City of Newark, 92 Oh St 393**, at 401; same case affirmed in 242 U. S., 405; Columbus Gas and Fuel Co. v. City of Columbus, 17 Fed. 2d, 630, Fed. Dist. Court, Southern District of Ohio, Eastern Division (1927); **Dayton Power & Light Company v. Public Utilities Commission of Ohio, 127 Oh St 137**, same case affirmed in 292 U. S., 290, Mr. Justice Cardozo, speaking for the Court.

Headnote No. 23 reads as follows:

"The cost in imaginary conditions of cutting and restoring pavements is not an increment of value to be taken into consideration in determining the rate base for a gas company."

Applicant contends that to make deductions such as the Staff has made with respect to this account both distorts and violates the reproduction cost concept of valuation and that to be submitted to the requirement of proving that pavement over conduits was actually cut and restored in the process of construction of such underground conduits is extremely difficult and works a hardship on it as the Applicant. The premise that a single impulse reproduction of plant at the date certain would necessitate the cutting and restoration of all pavement in place over conduits, and, accordingly, such costs be fully capitalized in Account 244 for rate base valuation purposes are not only negated by the above-cited authorities, but by the dictates of practicalities and the application of common sense. To permit the inclusion of such costs in the capital values of a utility's property would represent items of value for which the Company and its stockholders have never made expenditures.

The reproduction cost new of a utility's property should reflect and purport to be the current day cost of expenditures actually made to construct the presently existing plant and property rendering the present utility service, and should not reflect value for costs never expended unless such costs are shown to be requisite to the reproduction of the extant plant.

The argument that a given standard of proof should not be required because of the difficulty in meeting such standard does not bear analysis particularly under this circumstance, since the public has been required

to pay in the first instance for the cost of paving, as part of the overall cost of service, and, thus, should not be required to do so a second time without some affirmative and positive showing by the Applicant Utility of actual expenditure. Mt. Vernon Telephone Corp. v. Public Utilities Commission of Ohio, supra.

Accordingly, therefore, the Commission finds that Applicant's objections to these deductions for Inventory Corrections from its submitted reproduction cost new valuation are not well taken in light of the record herein and adopts the Staff's recommendation in this regard.

**B. Unit Cost Corrections:**

| Acct. No. | Description | |
|---|---|---|
| 207 | Deduct Direct Cost Loading (9.14%) | $ 4,200.48* |
| 211 | Deduct Direct Cost Loading (9.14%) | 26,166.46* |
| 212 | Deduct Direct Cost Loading (9.14%) | 121,022.93* |
| 221 | Deduct Direct Cost Loading (9.14%) | 224,798.13* |
| 231 | Deduct Direct Cost Loading (9.14%) | 97,750.53* |
| 231 | Add to correct Under-Pricing | 51,061.28 |
| 232 | Deduct Direct Cost Loading (9.14%) | 41,432.67* |
| 232 | Deduct to correct Over-Pricing | 52,568.71* |
| 233 | Deduct Direct Cost Loading (9.14%) | 30,333.86* |
| 233 | Add to correct Under-Pricing | 61,629.16 |
| 234 | Deduct Direct Cost Loading | 47,699.39* |
| 234 | Deduct to correct Over-Pricing | 66,721.55* |
| 235 | Deduct Direct Cost Loading | 1,625.35* |
| 235 | Deduct to correct Over-Pricing | 670.12* |
| 241 | Deduct Direct Cost Loading | 74,061.38* |
| 241 | Deduct to correct Over-Pricing | 37,102.79* |
| 242-A | Deduct Cost Loading | 98,197.15* |
| 242-A | Deduct to correct Over-Pricing | 32,778.27* |
| 242-U | Deduct Direct Cost Loading | 130,124.09* |
| 242-U | Add to correct Under-Pricing | 21,202.63 |
| 243 | Deduct Direct Cost Loading | 36,274.85* |
| 243 | Add to correct Under-Pricing | 48,926.38 |
| 244 | Deduct Direct Cost Loading | 220,986.33* |
| 244 | Add to correct Under-Pricing | 306,545.91 |
| 261 | Deduct Direct Cost Loading | 9,822.61* |
| 261 | Add to correct Under-Pricing | 2,149.87 |
| 264.4 | Deduct Direct Cost Loading | 2,583.12* |
| 264.4 | Add to correct Under-Pricing | 2,583.12 |
| 264.5 | Deduct Direct Cost Loading | 9,643.35* |
| 264.5 | Add to correct Under-Pricing | 1,055.07 |
| | Net Total | $871,411.20* |

Note: * Denotes Red Figure

To properly analyze and discuss the question of the Engineering Staff's "Unit Cost Corrections," and Applicant's objections to such deductions, examination should first be made of the method used by Applicant's Consulting Engineer in arriving at the reproduction cost new valuation appraisal of the Company's plant and property.

Applicant's valuation witness testified that an actual physical in-

ventory and appraisal was in fact made. Allegedly, unit costs were developed by obtaining material prices from standard manufacturers and suppliers, by using labor rates prevalent in the area operated by the Company, by using representative and standard labor hours and by pricing out the items of inventory on this basis. Having established a priced out valuation for each item in each primary account, there was then added to the balance in **each** primary account an amount equalling 7% of such balance, which is said to represent "Plant Supervision, Tool and Supply Expense." To these account balances there was then added another allowance in the amount of 2% which is claimed to constitute "Omissions and Contingencies." Such allowances might well be termed direct overhead costs or "direct cost loadings."

It is to be noted in this connection that these percentages actually, by reason of the "pyramiding" of the second on the first become 9.14%, rather than the arithmetical sum of 7% plus 2% of the same account balance, and have been applied against every primary plant account regardless of the character of the property contained in the account.

It appears to the Commission that the arbitrary application of such an appraisal procedure could prove patently unsound and fail to accord with appraisal realities.

In the absence of affirmative evidence the question might well be raised how the items of Plant Supervision, Tool and Supply Expense would be incurred in the reconstruction of property contained in such accounts as Right of Way, Land, Buildings, Central Office Equipment, Furniture and Office Equipment, Tools and Vehicles. It is to be noted that the record evidences Buildings and Central Office Equipment would be constructed by way of construction or installation contracts. As to omissions, the same reasoning is somewhat comparable as that applicable to the foregoing rationale relative to the inclusion of cost of paving cut and restored in Account 244 by reason that the property represented by the inventory is already known and specified, both quantitatively and qualitatively as of the date certain. In determining the value of Applicant's property, a reasonable hypothesis must be made to estimate the cost to reproduce as of a date certain, a physical plant which is actually proven to be in existence as of that date certain. Value cannot be added to such utility plant and property on the theory that the Valuation Engineer is estimating the cost of constructing as of a date certain, a hypothetical telephone plant on a single impulse basis which must be planned from the ground up. If that were being done, provisions for omissions would be valid; however, the character, quantity, condition and location of the utility plant is fixed and specified by the inventory and appraisal. Items of engineering, planning, and like preliminary expenses attendant to the production of a utility plant should prove to be minimal except for those requisite to the actual processes of reconstruction.

Detailed analysis and review of the record does give rise to some question as to the efficacy of the labor rates, as well as the labor crew components, employed by the Commission's Engineers in certain of their estimates of the unit costs. Some doubt is also raised in comparable instances as to the like estimates employed by the Company's Consulting

Engineers. Both of the respective component estimates may well merit some degree of reappraisal.

The Commission notes that the Applicant's valuation witness repeatedly alluded in his testimony to methods that would be used by a general construction contractor in estimating and preparing bids for a construction contract, which methods were not, in the opinion of the Commission, those that were shown necessarily should be utilized in estimating a valuation for rate-making purposes in this case where many of the factors of reproduction are established. By virtue of the state of the record and the statutory burden of proof upon the Applicant, the Commission is of the view that it is compelled, therefore, to reject Applicant's valuation method in these respects, and to adopt its Engineers' recommended adjustments.

In this connection it should be noted that, as was disclosed by the testimony of the Commission's Chief Engineer, allowances for Plant Supervision, Tool and Supply Expense, and Contingencies are not rejected in their entirety, but, rather, are reflected directly in the Engineers' computations of unit costs, where direct cost loadings would appear to be more appropriate, inasmuch as this is substantially the manner such costs are treated in the ordinary development and construction of a utility plant. Thus, as stated above, the Commission adopts the Engineers' recommended deduction of $871,410.70 as specified in Engineers' Exhibit 1, Sheet 1 of 1, of the Report of the Secretary, styled "Unit Cost Corrections."

C. Corrections of General Overhead Allowances:

The Applicant's Consulting Engineer, by pricing out the inventory and adding provisions for Plant Supervision, Tool and Supply Expense and for Omissions and Contingencies, arrived at an estimated direct cost valuation. Added thereto, then, was a percentage (26%) of such direct cost as provisions for "General Overheads." These may be encompassed within two principal categories: First, Preliminary Organization, Legal and Engineering Expense, and, secondly, Organization, Legal, General Engineering, Accounting, Casualities, Insurance, Taxes, and Interest During Construction. The first category amounted to an addition of $843,069.00, while the second represented an aggregate increment for both exchanges of $2,810,220.00. The method of computation utilized was to apply 6%, representing preliminary organization, legal and engineering expense, to the previously ascertained primary account balances. Then, there was added thereto a sum equivalent to 20% of the same base amount representing Organization, Legal Expense, etc. As in the case of direct cost loadings, the same percentage rates were applied against every primary account, regardless of its character.

To purportedly validate the 2% plus 7% direct loading charges. and 26% general overhead allowances, Applicant submitted its Exhibit 6 which was represented to be a separate item-by-item overhead study applicable to the property valuation of The Warren Telephone Company. The exhibit evidences that the period of reproduction of the telephone plant and property would be not less than three years, and that all overheads are established and weighted on this estimate.

Analysis of the exhibit, and Commission examination of the Company's valuation witness, would appear to disclose that Applicant's Exhibit 6 reflects certain items of expense not properly capitalizable, some degree of duplication, and costs and expenses which, in the absence of an affirmative showing, could well be considered to be in excess of those overhead costs which would be incurred in the reproduction of a hypothetical telephone plant similarly situated to that of the Applicant. For example, at page 3-A of the Exhibit, styled "Detail of Preliminary Organization, Organization and Legal," there is set forth a breakdown of estimated organizational expense and costs incident to the sale and issuance of Applicant's capital. A factor purporting to represent the incurrence by Applicant of these same expenses is seemingly contained likewise in the testimony of Applicant's rate-of-return witness, Dr. J. Rhoads Foster, and is included in that opinion witness' estimate of cost of money to the Applicant and the fair rate of return which the witness opines should be afforded to it.

Also included therein as "preliminary organizational" expenses are commercial and general expenses, characterized as "cost of attaching business" (commercial agent on survey and preliminary canvass, canvassers, etc.). Even if it were to be postulated that such costs are a part of the reproduction cost new valuation concept, their inclusion in the statutory rate base would seem to be, in the absence of direct evidence, precluded by the decision in City of Cincinnati v. Public Utilities Commission of Ohio, 96 Oh St 554. Nevertheless, present day utilization of the telephone evinces that the telephone, both practicably and sociologically, is no longer an instrument of convenience or luxury but, rather, one of general and, many times, of immediate necessity. The demand and other attendant requisites of telephone service to the subscribers of this Company are established and extant, moreover, as of the date certain of this proceeding.

The Commission is of the opinion, accordingly, that Applicant's Exhibit 6 is not of sufficient probative value to validate, in and of itself, Applicant's general overhead allowances in every instance without affirmative showings in those instances that such allowances are proper in the character and degree claimed.

By the application of the above-discussed percentages, the total of all of Applicant's general overheads capitalized in its primary accounts amount to $3,653,289.00. This sum, added to $901,210.00 and $275,513.00 representing respectively, allowances capitalized for Plant Supervision, Tool and Supply Expense, and Omissions and Contingencies, totals $4,830,012.00. The record shows that such dollar amount is 37.5% of Applicant's "priced out plant inventory costs" or "costs before overhead allowances," which constitutes, of course, a substantial percentage of the aggregate appraisal proposed by this Applicant.

The Engineering Staff, in computing its estimate of the reproduction cost new valuation which was recommended in this proceeding, ascertained "direct costs" for each primary account by pricing out the corrected inventory of the property in that account, and then added to such direct costs varying percentages for general overheads in accordance

with a schedule developed by them and based upon their judgment and experience. This schedule was offered and admitted into evidence as Applicant's Exhibit 9. For ready reference this schedule is attached hereto as Appendix A. In substantiation of the use of this schedule the Commission's Chief Engineer testified on cross-examination, that in his opinion the only proper method of determining provisions for general overheads in preparing a rate base valuation is to treat the primary accounts individually because of the varying nature of the property both incident to and within each primary account, the different duration of time required for the reconstruction of each of such properties, and the varying methods of acquisition and erection involved. (R. 634-638.)

It may be noted, parenthetically, while there may be nothing inherently unsound in the application of a flat or single percentage for general overheads to the sum of the direct costs for all acounts, that it would appear for such procedure to be acceptable, the derivation of such percentage must be shown in order to evaluate both its general and specific applicability. The Commission finds, therefore, that the recommendations of the Staff with respect to the allowances for general overheads, should be adopted in this proceeding in light of the record herein.

D. **Statutory Depreciation:**

As a result of its field analyses and other studies, the Commission's Engineering Staff determined the statutory depreciation extant in Applicant's plant and property used and useful in the rendition of telephone service to its subscribers as of the date certain in this case to be an amount not less than $1,523,449.00, which amount is 10.01% of the reproduction cost new appraisal as recommended by said Staff Engineers. The Engineering Staff recommended the following valuation appraisal:

Reproduction Cost New at December 31, 1957     $15,226,590.00
Less Depreciation (10.01%)     $ 1,523,449.00

Reproduction Cost New Less Depreciation     $13,703,141.00

In computing the rate base, the Staff determined that allowances for Working Capital should be made in the following amounts:

Working Capital     $ 88,185.00
Maintenance, Material and Supplies     192,000.00

Total     $280,185.00

Such an allowance, however, was not included in the recommended rate base valuation by reason of the fact that an examination of the Company's books and records disclosed that its continuing federal and other tax accruals would more than offset such an allowance. Accordingly, such an allowance was not included in the rate base recommended by the Staff in the Report of the Secretary.

In pursuance with the pronouncements and rationale of the Supreme Court's opinion in the case of **City of Cincinnati v. Public Utilities Commission of Ohio, 161 Oh St 395,** the Commission is compelled, perforce, to eliminate from said rate base valuation such allowances for working capital and maintenance, material and supplies, by reason that the

Applicant's continuing federal and other tax accruals offset such allowances.

The Commission is of the opinion, and so finds herein, that the statutory rate base for purposes of this utility rate proceeding is ascertained to be in the amount of $13,703,141.00 as of December 31, 1956, the date certain utilized in this matter.

## RATE OF RETURN

The next determination to be considered by the Commission is what percentage will represent a fair annual "rate of return" to this Applicant on the above-ascertained valuation of its property used and useful in rendering telephone utility service, and will thereby represent a yearly "reasonable compensation for the service rendered." See §4909.15 R. C.; City of Cleveland v. Public Utilities Commission of Ohio, 164 Oh St 442, 443-446; City of Marietta v. Public Utilities Commission of Ohio, 148 Oh St 173.

Applicant's capital ratios, after including as a portion of debt a Note in the face amount of $300,000.00, are as follows:

| | |
|---|---|
| **Equity** (Common Stock, Earned Surplus, and Installments on Capital Stock) | 18.95% |
| **Preferred Stock** | 21.41% |
| **Debt** | 59.64% |

The Applicant's exceedingly low equity position is said to be the result of financial failure of Applicant's predecessor company during the adverse economic conditions prevailing in the early 1930's. These financial reverses resulted in reorganization, certain dividend restrictions which are still in effect. and provisions from surplus to make up the value of outstanding preferred stock of Applicant's predecessor company.

Testimony presented by Applicant's rate of return opinion witness suggested 6.92% to be the composite cost of capital to this Applicant as of the date certain. This opined rate includes such items as cost of financing, market pressure, etc. In the development of this cost, however, the witness did not use the actual capital components of Applicant's capital structure, but, rather, assumed a hypothetical capital structure composed of 60% Equity and 40% Debt.

After analyses of the full record herein, the Commission is of the opinion, and it so finds, that a rate of 6.5%, after the payment of all operating expenses, taxes and depreciation charges, would appear to constitute a fair annual rate of return on this Applicant's statutory rate base valuation of its property used and useful in the rendition of telephone service and will thereby yield a yearly reasonable compensation for the service proposed to be rendered.

In determining this rate of return, the Commission has given due regard to the value of all the property actually used and useful in rendering the service, to the necessity of making reservations for surplus, depreciation and contingencies, and especially to this Applicant's seemingly low equity position.

In light of Applicant's financial history, including the aforementioned dividend restriction, additional capital raised by means of

equity financing would be highly expensive, if available at all. Recent debt financing, in addition to its high cost, has left this Company with little, if any, leverage in its capital structure. The 6.5% rate of return, as found by this Commission, should afford Applicant such needed additional leverage by the improvement of the proportion of the Equity component of its capital structure as well as much improved earnings position by which additional equity capital may well be attracted to this enterprise.

### DOLLAR ANNUAL RETURN

Application of the foregoing 6.5% rate of return against the above-ascertained statutory rate base appraised valuation of $13,703,140.58 will yield an annual dollar amount of return of approximately $890,700.00 after the payment of all operating expenses, including taxes and depreciation charges. Such dollar annual return would—

(1) Provide this Company with funds sufficient to meet the respective earnings requirements of the hypothetical capital components substantially equivalent to the above-ascertained statutory rate base together with an adequate balance to meet contingencies and surplus;

(2) Enable Applicant to pay 7% dividends on the proportionate hypothetical equity capital equivalent of the statutory rate base, on the basis of an approximate 50% pay-out ratio, after meeting a $76,000.00 annual sinking fund requirement out of equity earnings;

(3) Afford sufficient earnings to enable a hypothetical company having a hypothetical capital structure similar to the Applicant's to service its equity in the manner outlined above; and

(4) Avail earnings for a more adequate reservation for surplus to the end that Applicant's extant equity capitalization ratio be enhanced.

Accordingly, the Commission is of the opinion, and so finds, that this Applicant utility is entitled to an annual return of approximately $890,700.00.

### COST OF SERVICE

A. **Operating Expenses Other Than Depreciation:**

In order to make a determination as to whether or not the revenues presently being collected by Applicant are sufficient to yield an annual reasonable compensation for the service rendered, the Commission is of the opinion that revenues received and expenses incurred during the test period should be adjusted or "annualized" to reflect such fundamental considerations as station growth and known increases in cost levels. In preparing the Report of the Secretary, the Accounting Staff made adjustments accordingly on such bases, which are set forth in the accounting section of such Report and the exhibits attached thereto.

Revenue adjustments included the annualizing of revenues derived from both local and toll service. Further, an addition of $73,859.87 to record the additional toll settlement from The Ohio Bell Telephone Company, together with an adjustment of the total revenues emanating therefrom for uncollectibles, were effected in the Accountancy's Staff recommendations.

Various operating expense accounts were adjusted upward to reflect wage increases occurring during the test year and an allowance of

$31,257.39 was made to reflect additional expenses occurring by reason of the gain in station level. The expense of the rate proceeding was estimated at $135,000 and the amortization period recommended by the Staff for purposes of computing said rate case expense was three years. This recommendation was not shown to be unreasonable. Thus, the Commission finds herein, and will include an allowance of $45,000, reflecting one-third of this expense, in the computation of the aggregate cost of service.

In conclusion, the Commission finds, for the purpose of this proceeding, Applicant's operating expenses during the test year to be an amount in the sum of $1,141,878.12.

**B. Depreciation Accruals and Taxes:**

Applicant's Exhibit "D," submitted with and attached to its Application, is a table listing by primary accounts its so-called depreciable property, setting forth by such primary accounts the average recorded book values of its telephone plant as of December 31, 1956, present annual depreciation rate in percent, present annual dollar depreciation accruals, purported required annual depreciation rates in percent, and required annual dollar depreciation. This exhibit is discussed in the testimony of Mr. Ralph F. Mateer, Applicant's Executive Vice President and General Manager, and Mr. T. O. Jaques, a telephone accountant employed by Applicant's consulting engineer firm, the latter also having prepared and sponsored Applicant's Exhibit 7, an accounting exhibit purporting to validate the depreciation rates proposed by Applicant in its Exhibit "D."

The Commission finds that these depreciation requirements, as proposed by the Applicant, are primarily based upon data as filed in Applicant's Exhibit 7. It is proposed by Applicant that the composite accrual rate for all depreciable accounts as of the date certain be increased from the present 3.25% to 3.89%.

Applicant's Exhibit 7 would appear to contain the following:

(1) The December 31, 1956, ledger balances of each of the depreciable plant accounts (except 207 and 244) were arranged in order of the age of their balances for the last 23 years on the assumption that the pattern of retirements is generally made on a "first-in, first-out" basis (FIFO), that is, all retirements of plant are assumed to be of the longer-lived assets, and the balances in the plant accounts are assumed to be composed of the assets most recently purchased;

(2) The annual accrual rate actually used each year was applied to the annual FIFO balances, which resulted in FIFO basis annual accruals;

(3) The FIFO basis annual accruals for the 23-year period were totalled and compared with the actual balances in the depreciation reserve sub-accounts, and this resulted in alleged deficiencies in the depreciation reserve sub-accounts, or, as in the case of the Station Apparatus Account (231), an excess developed since the accrual computed on the FIFO basis was less than the actual amount in the reserve at December 31, 1956;

(4) Next, the respective deficiencies were added to (or excess sub-

tracted from) the respective total annual credits, and these sums were divided by the respective totals of the 23-year average book values, this procedure producing the so-called "adjusted accrual" rates; and,

(5) Lastly, these "adjusted accrual" rates were applied to all of the depreciable plant account balances as of January 1, 1957, to develop the amount of the adjusted annual accruals, the total of such accruals being $446,617.08, which was divided by the total book value of depreciable plant at January 1, 1957 ($11,700,492.22), thereby producing a composite rate of 3.8171%.

The end result sought to be produced by this Exhibit is the 3.8171% composite rate, which is to "* * * be applied to provide an adequate depreciation reserve for The Warren Telephone Company and to provide the proper expense charge to Account 608, Depreciation, * * *."

It would appear to be manifested, therefore, that the Applicant's proposed accrual rates are primarily predicated upon the assumption that the balance in the depreciation reserve account is an appropriate gauge of the adequacy of depreciation accruals. However, this is not necessarily a valid premise when consideration is given to the fact that periodic depreciation expense, as computed on a group basis, merely reflects an estimate of the average service life of all units of plant comprising a class, an account, or the composite total, without regard for the acknowledged fact that some units have shorter and some have longer lives than the average for all units in the class. The entire cost of a retired plant unit, after adjustment for net salvage, is charged to the depreciation reserve, without regard to whether or not the particular unit has attained its estimated average service life. Inadequate accumulations in a depreciation reserve sub-account for short-lived units is expected to be offset by over-accumulations for longer-lived units. Thus, in the absence of an affirmative showing to the contrary, the balance in a depreciation reserve sub-account would not appear to be a proper criterion for determining the adequacy or insufficiency of prior year or future depreciation charges; rather, it is more indicative of the mortality dispersion of the various types of units of property involved.

The development of accrual rates should be constructed in the first instance by engineering, not accounting, estimates predicated upon engineering experience, and adequately weighted for whatever is expected to be the character of the Company retirement distribution, and any possible changes in the art of the telephone industry.

In Exhibit 7, the first-in, first-out assumption as to retirements illustrates that in six out of the nine accounts studied, practically all of the plant assets have been acquired since 1947.

Therefore, unless it can be shown that the average lives and mortality characteristics of the assets retired between 1934 and 1947 were the same as the replacements since 1947, little weight can reasonably be given to such retirement experience in the establishment of proper accrual rates for the future. The Commission is of the opinion that the accounting testimony and related exhibits on this subject fail to demonstrate that such is the case.

If Applicant's procedure is valid it is to be expected that the use

of some year prior to 1956 as the base would produce a result reasonably similar to that reached by Applicant's accounting witness. Analysis of Exhibit 7, using the same assumptions, procedures and methods as those utilized by Applicant's accounting witness, but using different base years, produces neither similar nor patterned results, but substantial and erratic fluctuations from year to year. This further illustrates the lack of probative value in the procedures proposed by Applicant in support of its request for increased annual accrual rates.

The Commission notes that the significant factor causing the disparity between Applicant's estimated depreciation requirements and those calculated by the Engineering Staff, is the high balance in Account 244, "Underground Conduit," amounting to 26% of the total book value of Applicant's depreciable property. Applicant's Exhibit "D" shows that it is presently depreciating this account at an annual rate of 2.00%, and proposes an annual rate of 2.50%, whereas the Engineering Staff has recommended an annual rate of 1.50%.

After thorough analysis, the Commission is of the opinion that it should adopt the annual depreciation requirements recommended by its Engineering Staff, and, accordingly, therefore, finds that Applicant's annual depreciation accruals during the test year should be "pro-formed" to an amount in the sum of $355,682.17, and further finds that the annual percent depreciation rates to be applied to Applicant's depreciable property by primary accounts to be those recommended by the Engineering Staff. For purposes of reference, a table of such annual percent rates is attached hereto as Appendix "B."

Pursuant to the revenue and expense adjustments, hereinabove discussed, the Commission finds that Applicant's tax liabilities, on a **pro forma** basis, are as follows: Ohio Excise Tax, $63,909.39; PUCO Maintenance Assessment, $1,171.10; Other State and Local Taxes, $218,-379.12; and Federal Income Taxes, $371,191.20; totalling $654,650.81.

**Gross Annual Revenues:**

Application of annualization methods to Applicant's revenue accounts, and inclusion of the Ohio Bell toll settlement, produces during the test year adjusted gross revenues of $2,762,913.35. The Commission is of the opinion, and so finds, that this annual gross revenue as produced under existing rates and charges is insufficient to yield a yearly reasonable compensation to this Applicant for the telephone utility service rendered by it during the test year ending December 31, 1956.

Therefore, in accordance with the percentage rate of return and dollar annual return as hereinbefore determined, gross annual revenues allowable to this Applicant are herein found by the Commission to be the sum in the amount of $3,366,030.00, which is the arithmetical sum of the dollar annual return, cost of service, depreciation accruals and taxes. To produce this increase in gross revenues will require an increase of 21.83% in Applicant's presently authorized rates and charges.

**ULTIMATE FINDINGS:**

The Commission renders the following ultimate findings:

(1) That this Application is filed pursuant to, and this Commission has jurisdiction thereof under, the provisions of §§4909.17, 4909.18, and 4909.19 R. C.;

(2) That the investigation required of the Commission by the provisions of §4909.19 R. C., has been filed and served as required by said statute;

(3) That the Applicant's statutory rate base for purposes of this proceeding is an amount in the sum of $13,703,140.58;

(4) That the existing rates now being charged and collected by the Applicant for the furnishing of telephone service to its subscribers in its service areas are insufficient to provide Applicant with an adequate return on the value of its plant and property used and useful in the furnishing of such telephone utility service;

(5) That the fair annual rate of return on the previously ascertained statutory rate base is 6.5%;

(6) That the dollar annual return to which this Applicant is entitled for purposes of this proceeding is $890,704.00;

(7) That the annual allowable expenses of this Applicant for purposes of this proceeding, with the inclusion of operating expenses, taxes, depreciation and other expenses, aggregate $2,475,325.00;

(8) That the allowable gross annual revenues to which Applicant is entitled for the purposes of this proceeding is $3,366,030.00.

**ORDER:**

It is, therefore,

ORDERED, That in accordance with the findings and opinion herein set forth, the Applicant, The Warren Telephone Company, be, and the same hereby is, authorized to file with this Commission for its approval, adjusted tariff schedules increasing the rates and charges to subscribers in its service areas in the amount of $603,000.00, which will provide Applicant with a total gross annual revenue of approximately $3,366,030.00. It is further

ORDERED, That such tariff schedules may become effective subsequent to their approval by this Commission or upon such subsequent date as the Commission may designate. It is further

ORDERED, That the Applicant, as of the date of this order, for the purpose of determining annual depreciation accrual allowances, apply to its depreciable property by primary accounts the annual percent accrual rates herein determined by this Commission to be proper and attached to this order and incorporated herein by reference as Appendix "B."

|  |  |
|---|---|
|  | THE PUBLIC UTILITIES COMMISSION OF OHIO |
| Entered in Journal | Everett H. Krueger, Jr., Chairman |
| December 19, 1958 | Ralph A. Winter |
| A true copy: | Edward J. Kenealy |
| W. E. Herron, Secretary | Commissioners |

APPENDIX "A"

SCHEDULE OF GENERAL OVERHEADS

FOR EXCHANGES OF 10,000 STATIONS OR MORE

| Acct. No. | Account Title | Const. Period (Years) | Prelim. Org. | Engr. & Supt. | Adm. & Legal | Interest During Const. | Ins. & Tax During Const. | Misc. Const. Expen. | Total General Overheads |
|---|---|---|---|---|---|---|---|---|---|
| 207 | Right of Way | 2.00 | 3.00 | 4.50 | 4.00 | 5.00 | 3.75 | 2.00 | 22.250 |
| 211 | Land | 2.00 | 3.00 | 4.50 | 4.00 | 10.00 | 3.75 | 2.00 | 27.250 |
| 212 | Buildings | 1.50 | 3.00 | 4.50 | 3.00 | 3.75 | 3.75 | 2.00 | 20.000 |
| 221 | Central Office Equipment | 1.50 | 3.00 | 3.00 | 3.00 | 3.75 | 3.75 | 2.00 | 18.500 |
| 231 | Station Apparatus | 1.00 | 3.00 | 2.00 | 2.00 | 2.50 | 3.75 | 2.00 | 15.250 |
| 232 | Station Installations | 1.00 | 3.00 | 2.00 | 2.00 | 2.50 | 3.75 | 2.00 | 15.250 |
| 233 | Drop and Block Wires | 1.00 | 3.00 | 4.50 | 3.00 | 2.50 | 3.75 | 2.00 | 18.750 |
| 234 | Private Branch Exchanges | 1.25 | 3.00 | 3.00 | 3.00 | 3.125 | 3.75 | 2.00 | 17.875 |
| 235 | Booths and Special Fittings | 1.00 | 3.00 | 2.00 | 2.00 | 2.50 | 3.75 | 2.00 | 15.250 |
| 241 | Pole Lines | 1.75 | 3.00 | 4.50 | 3.00 | 4.375 | 3.75 | 2.00 | 20.625 |
| 242 | Cable | 1.75 | 3.00 | 4.50 | 3.00 | 4.375 | 3.75 | 2.00 | 20.625 |
| 243 | Aerial Wire | 1.75 | 3.00 | 4.50 | 3.00 | 4.375 | 3.75 | 2.00 | 20.625 |
| 244 | Underground Conduit | 1.75 | 3.00 | 4.50 | 4.00 | 4.375 | 3.75 | 2.00 | 21.625 |
| 261 | Furniture and Office Equipment | .50 | 3.00 | -0- | 2.00 | 1.25 | 3.75 | 2.00 | 12.000 |
| 264 | Vehicles and Other Work Equip. | .50 | 3.00 | -0- | 2.00 | 1.25 | 3.75 | 2.00 | 12.000 |

APPENDIX "B"

ANNUAL DEPRECIATION ACCRUAL RATES BY PRIMARY ACCOUNTS

TO BE USED BY THE WARREN TELEPHONE COMPANY

AS INDICATED IN THIS ORDER

| ACCT. NO. | ACCOUNT TITLE | ANNUAL RATE |
|---|---|---|
| 207 | Right of Way | 2.00 |
| 212 | Buildings | 1.60 |
| 221 | Central Office Equipment | 3.50 |
| 231 | Station Apparatus | 4.50 |
| 234 | Private Branch Exchanges | 4.50 |
| 235 | Booths and Special Fittings | 5.00 |
| 241 | Pole Lines | 3.60 |
| 242 | Cable | 3.50 |
| 243 | Aerial Wire | 6.00 |
| 244 | Underground Conduit | 1.50 |
| 261 | Furniture & Office Equipment | 6.00 |
| 264 | Vehicles & Other Work Equipment | 20.00 |
| | Composite Rate—Based on Book Values as of Date Certain 1/1/57 | 3.194 |